Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta.

La libertad está en ser dueños de la propia vida.

—Platón

Sin libertad no hay lo que llamamos persona.

—Octavio Paz, La llama doble
A través de una opinión, a mi juicio incompleta, la mayoría del Tribunal ha evadido la aplicación de las doctrinas que en virtud de nuestra evolución jurídica en el campo del derecho privado, particularmente en torno a la acción de divorcio, nos pareció prudente articular hace varias décadas. Me refiero a las doctrinas desarrolladas a la luz del derecho a la autonomía personal consagrado en nuestro ordenamiento como corolario de los derechos a la intimidad y dignidad humana. Al proceder de esta manera, la mayor parte de los miembros de esta Curia ha limitado injustificadamente el cauce de una obligada corriente jurisprudencial, provocando una conclusión jurídica desfasada en los tiempos actuales.
La opinión de la Mayoría abona a la falta de contextualización histórica, social y cultural característica del trato reciente de este Tribunal a diversas áreas del derecho de la persona. Nuestro derecho civil queda, una vez más, restringido a una intención legislativa centenaria, extraña y obsoleta. La Mayoría olvida que nuestro Código Civil, en materia de derecho de familia, quedó plasmado hace más de un siglo en virtud de un discurso legal plagado de consideraciones morales ya vetustas. Al comparar el estado actual del derecho que regula el divorcio con el desarrollo de los derechos fundamentales, nos vemos ante una situación *350 jurídica en la que es menester nuestra intervención por mandato constitucional.
La Sec. 19 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, impone una interpretación liberal de los derechos del ser humano contenidos en nuestra Carta de Derechos, a la vez que prohíbe la exclusión de otros derechos pertenecientes al pueblo en una democracia. En varias ocasiones hemos insistido en que al interpretar nuestra Constitución debemos garantizar la continuada vigencia de sus valores fundamentales frente a las nuevas realidades del país. En ese sentido, nuestro rol es evitar que interpretaciones inflexibles y el apego a viejos modelos impidan que nuestra Constitución aplique a las eventualidades del futuro y en pocos años tornen obsoleta una Constitución diseñada para guiar la vida de un pueblo por varios siglos. Por eso, al interpretar los contornos de esa Constitución, debemos garantizar su vigorosidad y relevancia a los problemas de nuestro tiempo. Emp. Pur. Des., Inc. v. H.I.E.Tel., 150 D.P.R. 924, 948-949 (2000); Nogueras v. Hernández Colón, 127 D.P.R. 405, 411 (1990); P.I.P. v. C.E.E., 120 D.P.R. 580, 613 (1988); Pacheco v. Vargas, Alcaide, 120 D.P.R. 404, 410 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219, 227 (1987).
La controversia que hoy nos toca resolver involucra uno de los derechos fundamentales del ser humano dentro de una sociedad liberal y democrática. Hablamos del derecho a que el estado no se inmiscuya en la toma de cierto tipo de decisión perteneciente al ámbito de la intimidad matrimonial y familiar, ya sea imponiendo una carga indebida a quien desee hacer uso de sus derechos, o eliminando los medios adecuados para la realización de la voluntad personal. Nos referimos al derecho que tiene todo ser humano a desarrollarse libremente dentro del entorno familiar y tomar la decisión de disolver un vínculo o asociación voluntaria como es el matrimonio. En fin, hoy nos toca ex-presarnos sobre la reconocida libertad de la cual goza toda persona en una sociedad democrática para desarrollarse existencialmente. Para exponer mi opinión, exploraré la *351 visión tradicional de las instituciones familiares como el matrimonio y el divorcio y la evolución del rol de la autonomía de la voluntad en áreas tradicionalmente vinculadas a la intimidad dentro de una sociedad liberal como la nuestra. Al declarar mi disenso, me guía la continua y manifiesta necesidad de calibrar nuestro derecho privado a las transformaciones de la sociedad contemporánea.
Para comenzar, me parece atinado recordar a esta Curia lo que en Díaz González v. Tribunal Superior, 102 D.P.R. 195, 200-201 (1974), nos pareció propio recalcar:
[N]o hace daño que cuando el abogado o el juez interpretan o aplican una institución importante del derecho estén conscientes de sus raíces y de su desenvolvimiento a través del tiempo. Si eso es mucho pedir, por lo menos deben estar conscientes de que hay tales raíces y tal desarrollo; que no se trata de meras improvisaciones de ayer que existen por capricho.
En sociedades agrarias, la familia era fundamental para la sobrevivencia misma. El núcleo cercano, unido por estrechos lazos sanguíneos, conformaba la comunidad más próxima con la que podía contar el ser humano en sociedad. El matrimonio era la base de la familia, pues de éste surgían el sustento económico y doméstico, y la autoridad que organizaba al pequeño grupo social. Según nos recuerda Diego Espín Cánovas, ya decía Cicerón que el matrimonio era principium urbis et quasi seminarium reipublicae(1) El matrimonio era considerado la piedra angular de la sociedad, y de ahí el empeño de los juristas tradicionales en resaltar su carácter institucional. Según Merry Wiesner Hanks,(2) las consecuencias del divorcio podían ser desastrosas, pues al disolverse el matrimonio quedaban delebles la existencia social y la vida.
Para Espín Cánovas, al igual que para muchos, el matrimonio es
*352 ... la institución básica del Derecho de Familia, y por ello se comprende fácilmente que toda la importancia social que se reconoce a la familia ... se concentre especialmente en el mismo matrimonio. ... Estos diversos aspectos del matrimonio, que no cabe separar de su consideración jurídica, han de repercutir necesariamente en el concepto del mismo, desde el punto de vista del Derecho. Espín Cánovas, op. cit., pág. 16.
Puig Brutau,(3) cita a Vallet de Goytisolo(4) cuando dijo que el Derecho viene dado por circunstancias reales y por datos metajurídicos, especialmente en el derecho de familia. Entre estos datos metajurídicos se encuentra el contenido ético de las llamadas “instituciones del derecho de familia”. Puig Brutau resume este asunto con una cita de Ruggiero:(5)
En ningún otro campo influyen como en éste la religión, la costumbre, la moral. Antes que jurídico, la familia es un organismo ético. De la ética, en efecto, proceden los preceptos más esenciales que la ley presupone y a los cuales hace constante referencia, apropiándoselos a veces y transformándolos de este modo en preceptos jurídicos ....
Espín Cánovas expone su visión sobre la regulación social de la institución familiar:
Sobre estas realidades sociales convergen, de una parte, el Derecho, y de otra, la religión, la ética y las costumbres, disciplinando cada uno de estos órdenes normativos, los organismos familiares, desde su punto de vista. ... Así, pues, el fondo predominantemente ético de la familia, como institución social, repercute en su regulación jurídica, y es la primera y más destacada característica del Derecho de familia.
Estas características propias del Derecho de Familia le dan una fisonomía publicística .... (Énfasis omitido.) Espín Cánovas, op. cit., págs. 4-5.
Como ya mencionamos, la institución del matrimonio se nos presenta en sus orígenes en la civilización occidental *353 como una institución civil organizada en torno a consideraciones mayormente de índole económica.(6) Los conceptos de amor y sexualidad no siempre se concebían como parte de la relación matrimonial, cuyo propósito se reducía más bien a la reproducción y al buen manejo de la economía doméstica. Con el pasar del tiempo, y con el refinamiento de las costumbres, se fue desarrollando una dimensión moral, espiritual y conceptual de la pareja dentro del matrimonio, relacionada a la búsqueda de la felicidad.(7) De ahí el rol determinante de la autonomía de la voluntad manifestada mediante el libre consentimiento (y la capacidad para expresar dicho consentimiento) a entrar en la relación matrimonial canalizada mediante el cumplimiento de los requisitos formales impuestos por la legislación.(8)
Como nos explica el jurista Vázquez Bote,(9) por el rol imperante del consentimiento en la unión matrimonial, la concepción contractualista del matrimonio, fue acogida por las doctrinas del individualismo liberal decimonónico. Como es conocido, dicha vertiente filosófica configuró la ideología subyacente a la codificación.
El Art. 68 de nuestro Código Civil, 31 L.P.R.A. see. 221, define el matrimonio como una institución civil que procede de un contrato civil en virtud del cual un hombre y una mujer se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone. Ser válido solamente cuando se celebre y solemnice *354 con arreglo a las prescripciones de aquélla.....En palabras de Vázquez Bote, el matrimonio es el acto jurídico que [origina] la relación familiar ... al actuarse [origina] la comunidad familiar.(10)
Luis Arrechedera,(11) se refiere al consentimiento y a la forma, en un sentido muy amplio como coprincipios constitutivos de la relación matrimonial. En cuanto al aspecto formal del lazo conyugal, nos aclara Vázquez Bote:
El formalismo jurídico pudo expresar esa proyección consagrando el acto de unión [matrimonial] como legal; pero, es claro, que la legalidad no atribuye permanencia, sino simple adecuación a las exigencias de la norma ... [no] debemos pretender que esa permanencia subsista hasta la muerte de ambos cónyuges, pues, entonces estaramos volviendo la espalda a la realidad de la vida, que fija los conceptos jurídicos. (Enfasis omitidos.) Vázquez Bote, op. cit., pág. 22
Por tales consideraciones, el Código Civil introduce la posibilidad de la disolución del vínculo matrimonial en el mismo artculo que incorpora la definición del matrimonio en nuestro régimen civil. Según la letra del citado Art. 68, las limitaciones a la disolución del vínculo quedan demarcadas por las causales expresamente previstas en el Código Civil.
Detengámonos un momento a considerar el origen de la tendencia occidental de delimitar causas para disolver el vínculo matrimonial. En la cultura occidental de tradición judeocristiana, las causales de divorcio se fueron forjando a la luz de la moral eclesiástica.(12) El vocablo “divorcio” proviene del latín divortium, y aparte de su significado literal, el término aludía al efecto producido por el acto de manifestación de voluntad contra la continuación del matrimonio.(13) La cesación del vínculo de la vida marital *355 ocurría cuando se perdía la capacidad de la affectio maritalis:
Si el matrimonio exige un acuerdo continuo, cuando este acuerdo viene a faltar, necesariamente el hombre y la mujer no pueden ser considerados más como marido y mujer. Esto era tan vivamente sentido por los romanos, que no s[ó]lo ellos habrían considerado un absurdo el concebir que el matrimonio perdurara, cesado el acuerdo entre los cónyuges, sino que consideraban además como torpe y era vedado por el Derecho para la tutela de la moralidad el obligarse expresamente a no divorciarse o a pagar una pena en caso de divorcio.(14)
Desde que Constantino institucionalizó la religión dentro del Imperio Romano en el siglo IV, se fue desarrollando una estrecha relación entre la iglesia y el Estado. Las ideas cristianas llegaron a dar forma a las leyes imperiales y a las prácticas judiciales.(15) Como nos explica WeisnerHanks, “[l]a política sexual de la iglesia y los temas relacionados con ella no era simplemente un asunto de tratados aprendidos, sino que se debatía y a veces se decidía en los concilios”(16) y sínodos, que funcionaban como tribunales, cuyas
... decisiones, normalmente llamadas cánones, fueron creando gradualmente un cuerpo de leyes de la Iglesia y unas normas en asuntos sexuales .... [L]a ley de la iglesia (conocida como Derecho canónico) y la ley secular ... estaban estrechamente relacionadas en la práctica. (Enfasis en el original.)(17)
Ya para el siglo XIII, “el Derecho canónico y los tribunales de la Iglesia controlaban casi todos los aspectos del matrimonio (excepto en los temas de propiedades)”.(18) Las causales aceptadas por el derecho canónico fueron el adulterio, el abandono, la impotencia y la esterilidad. A pesar de la secularización del Estado, durante la codificación de *356 cimonónica se adoptaron dichas causales, al igual que otras de origen secular, tal como la causal de divorcio por injurias graves. Posteriormente se incorporaron las causales de divorcio por demencia del otro cónyuge y por separación.
En nuestra jurisdicción, la causal de separación estableció el divorcio unilateral mediante la separación intencional de las partes por un término fijo de años.(19) El propósito de la separación es brindarle a uno o a ambos cónyuges la oportunidad de disolver un matrimonio que sólo subsiste en la mera formalidad. Cuando se incorporó esta causal, el término original era de siete años; luego, mediante enmiendas, quedó fijado dicho término a dos años. La razón de ser del término es hacer constatar la intención de la separación; dicho periodo de tiempo se supone que establece la presunción de que la ruptura es un hecho consumado.(20) La separación que requiere la causal ha de ser, además, pública y notoria. Cosme v. Marchand, 121 D.P.R. 225 (1988); Cabrer v. Pietri, 67 D.P.R. 437 (1947). Los requisitos que condicionan la causal de separación nos llegan desde la antigua concepción del matrimonio como asunto público. De acuerdo con dicha concepción, la sociedad tenía licencia para inmiscuirse en espacios que en tiempos actuales hemos convenido reconocer que pertenecen a la esfera privada. Mediante el período de dos años de separación pública y notoria la pareja prueba ante la comunidad que desea divorciarse de su cónyuge. Cabrer v. Pietri, supra. En fin, el término de dos años que requiere la separación no tiene nada que ver con la privacidad que debe imperar en las decisiones personales, sino con el antiguo rol del colectivo comunitario como testigo en los asuntos maritales.(21)
*357 A pesar de que hoy parece amainada una concepción del matrimonio arraigada al valor de dicha institución dentro de la sociedad agraria, la existencia de causales específicas para disolver el vínculo matrimonial denota que el Código responde a una ideología premoderna, ajena a las transformaciones legales que trajo consigo el constitucionalismo moderno.
Fuera del Código Civil, y desde hace más de tres décadas, la realidad es otra. La protección del vínculo matrimonial se ha volcado hacia los componentes de la unión matrimonial, qua individuos que libremente han decidido enlazar sus existencias.(22) El reconocimiento de la libertad personal y la autonomía de la voluntad han llevado un renovado concepto occidental de libertad al Derecho de familia, inclusive hasta la recámara. Como explica Joseph Raz,(23) en las sociedades occidentales industrializadas ha tenido gran acogida la autonomía personal, que considera la libre determinación de metas y relaciones personales como ingrediente esencial del bienestar individual. Para el autor, dicho ideal es particularmente afín con la era postindustrial, en cuanto a sus características (el continuo avance de las tecnologías y el libre flujo laboral) y sus exigencias para con el individuo (como la habilidad para adquirir nuevas destrezas, la habilidad de adaptarse al cam-bio, la movilidad social entre subculturas, la aceptación de nuevas visiones científicas y morales, etc.). La autonomía se opone a la coacción en la toma de decisiones, o bien, a la ausencia de opciones entre las cuales escoger. Para Raz la autonomía personal no se da en el vacío; es necesario que las personas tengan una gama adecuada de alternativas y que cuenten con un nivel de independencia de criterio tal, que sus decisiones no estén irrazonablemente manipuladas ni dirigidas por ideas preconcebidas y externas.
*358 Debido al enfoque político que usualmente convoca el tema de los derechos humanos, el ámbito de los llamados “derechos de la personalidad” ha sido tema casi exclusivo del derecho público. Como resalta Puig Brutau,(24) la trascendencia de los derechos de la personalidad “puede explicar que su protección se entendiera había de corresponder al Derecho público”. Ante esta común situación, Luis Diez-Picazo y Antonio Gullón señalan:
La persona no es exclusivamente para el Derecho civil el titular de derechos y obligaciones o el sujeto de relaciones jurdicas. Si esta rama del ordenamiento jurdico se caracteriza bsicamente por ser la dedicada a la persona en s misma considerada, debe ocuparse de la proteccin de sus atributos fsicos y morales, de su libre desarrollo y desenvolvimiento. De ah que se hable de los derechos de la personalidad, que son dice exactamente FERRARA, los derechos supremos [de las personas], los que le garantizan el goce de sus bienes personales: el goce de s mismo, la actuacin de sus propias fuerzas fsicas o espirituales.(25)
Los textos constitucionales básicos de los Estados proclaman el respeto a la persona, a sus atributos y libertades de un modo amplísimo, reconociendo así una esfera individual que el poder del Estado no puede avasallar. Sin embargo, hoy se ha extendido hacia el campo del Derecho privado la preocupación por la defensa de la persona .... En este punto debe destacarse una falta de atención de los Códigos decimonónicos a esta materia, que fue cubierta en todos los países por una jurisprudencia progresiva. (Enfasis nuestro.)(26)
*359 Dentro de los llamados derechos de la personalidad se encuentra el derecho a la libertad personal. Vázquez Bote define ese derecho como el que permite “determinar nuestras acciones sin coacción externa alguna, ofreciendo [a todas las personas], la posibilidad real de autorealizarse, exigiendo que no se opongan obstáculos inmotivados a nuestra actividad”. (Enfasis omitido.)(27) Dentro de las libertades personales se encuentran las que Vázquez Bote llama “libertades morales”. Según el autor, éstas consisten en una
... serie de libertades, que deben reconocerse al individuo, originarias de los correspondientes derechos, y que afectan a las esferas más íntimas y exclusivas de la persona humana; las cuales, no obstante este carácter, tienen trascendencia social .... Se trata de esferas de la personalidad a las cuales se entiende que el individuo no renuncia, ni tiene por qué coartarlas, en reciprocidad por la convivencia social.(28)
Vázquez Bote apunta a tres manifestaciones de estas libertades y derechos destacadas por la doctrina: “la libertad y el derecho a determinar el modo de vida”; “la libertad en la esfera íntima o derecho de privatividad” y “la libertad de conciencia y de elección”.(29)
Esta particular concepción del derecho a la libertad personal no se encuentra entre los derechos y las garantías expresamente expuestos en la Constitución del Estado Libre Asociado de Puerto Rico, a diferencia de otros textos constitucionales. En igual condición se encuentra la Constitución estadounidense. A través de la historia jurisprudencial, tanto norteamericana como puertorriqueña, el de *360 recho a tomar cierto tipo de decisión importante se ha vinculado al derecho a la intimidad y a la dignidad humana.
Según Ferdinand David Schoeman,(30) existen varios tipos de normas sociales que le dan forma a lo que entendemos por intimidad. Una de ellas restringe el acceso al espacio donde tradicionalmente se le ha otorgado amplia discreción al individuo para que dirija su comportamiento. Como explica el autor, esta norma permite que exista la vida privada, la individualidad, la asociación con otras personas y la integridad de las varias esferas de la vida. Para Schoeman, dicha norma fomenta la expresión individual, pues el sujeto tiene la libertad para escoger. Al actuar dentro de los lindes discrecionales y tomar una decisión, las personas se colocan en lo que Schoeman llama expressive role. Por ejemplo, una persona puede decidir casarse o separarse de otra, y al hacerlo, su acto contiene la expresión de su voluntad. La protección constitucional a la intimidad cobija también esos actos decisorios, pues a través de éstos se manifiesta y expresa la historia personal que cada cual va forjando.
Charles Fried(31) opina que aun cuando cada derecho fundamental se reconoce para asegurar otro valor que la convención social haya considerado necesario, la intimidad se distingue de otros derechos al no ser sólo una vía para garantizar otros derechos. La intimidad es primordial para las relaciones y los fines del tipo más fundamental, como por ejemplo el respeto, el amor, la amistad, la confianza y el afecto. Sin protección a la intimidad, la mera posibilidad de alcanzar dichos fines o sostener dichas relaciones es inconcebible, la existencia misma del amor, el respeto, la amistad y la confianza depende de la intimidad. La intimidad es el contexto donde dichas relaciones se desarrollan, *361 por lo que una amenaza a la intimidad implica una amenaza a nuestra integridad como personas.(32)
En otras jurisdicciones se puede ver el creciente reconocimiento de la protección a la autonomía de la voluntad. Luis Javier Mieres Mieres(33) hace un estudio de la autonomía personal según protegida por el derecho a la intimidad y la dignidad personal que reconoce la Constitución española. Al respecto, nos dice que
[e]l respeto que merece toda persona, en tanto ser humano, deriva de su capacidad para elegir, modelar y cambiar su propio plan de vida, de buscar su felicidad a su manera. La creación y control de espacios de reserva es, por un lado, resultado del ejercicio de la autodeterminación individual, pues cada cual decide la medida en la que quiere ser dejado en paz .... Respetar esas zonas es respetar la voluntad de quien las ha creado. Por otro lado, constituyen una condición necesaria para el ejercicio mismo de la “autonomía del individuo para elegir entre las diversas opciones vitales que se le presenten, de acuerdo con sus propios intereses y preferencias” (STC 132/ 1989 ...). L.J. Mieres Mieres, Intimidad personal y familiar: prontuario de jurisprudencia constitucional, Navarra, Ed. Aranzadi, 2002, pág. 27.
Mieres Mieres nos refiere también a la Sentencia del Tribunal Constitucional de España 151/1997, según la cual las sentencias judiciales que sancionan actos que han sido reconocidos como parte del derecho a la intimidad implican una “acción”, “cuyo objetivo es la modificación de una pauta de conducta desarrollada en el ámbito de la vida privada”. Concluye entonces el Tribunal Constitucional que
[s] ometer a sanción determinados comportamientos o decisiones estrictamente personales supone una restricción del libre desarrollo de la personalidad y del núcleo decisional del derecho a la intimidad. Mieres Mieres, op. cit., pág. 30.
*362 La jurisprudencia estadounidense es perfecto ejemplo de la tendencia que hoy nos parece de obligada aplicación al caso de autos. La trayectoria del reconocimiento de la autonomía decisional como parte de la libertad protegida por el debido proceso de ley y el derecho a la intimidad presentan una evolución ascendente hacia el reconocimiento abarcador de dichas protecciones. Como punto de partida, tenemos la opinión disidente del Juez Brandéis en Olmstead v. United States, 277 U.S. 438, 478 (1928), que se ha convertido en epítome del derecho a la intimidad según concebido por la doctrina anglosajona. En dicha opinión, el Juez Brandéis explica cómo los autores de la Constitución estadounidense se ocuparon de asegurar unas condiciones constitucionales que fueran cónsonas a la búsqueda de la felicidad. Al reconocer el significado de la espiritualidad, de los sentimientos y del intelecto humano, los creadores de la Constitución buscaron proteger las creencias, pensamientos, emociones y sensaciones del ser humano. Por ello, les fue concedido a las personas el derecho a que el gobierno les deje quietas (the right to be let alone), el cual, según el Juez Brandéis, es el más abarcador de los derechos, y el más valorado por las gentes civilizadas.(34)
La muy citada opinión mayoritaria de Griswold v. Connecticut, 381 U.S. 479 (1965), explica que la Cuarta y la Quinta Enmiendas de la Constitución de Estados Unidos representan protecciones contra todo tipo de intrusión gubernamental, tanto en el santuario del hogar como en los aspectos considerados como privados en la vida. En esa opinión mayoritaria se reconoció que las decisiones tomadas durante la relación matrimonial se encuentran dentro *363 de la zona de intimidad protegida por la Constitución. Posteriormente, en Loving v. Virginia, 388 U.S. 1, 7 (1967), el Tribunal Supremo expresó que los poderes estatales de reglamentación matrimonial están sujetos a las protecciones que brinda el derecho al debido proceso de ley sustantivo y a los intereses libertarios incluidos en la Decimocuarta Enmienda de la Constitución estadounidense.
En Roe v. Wade, 410 U.S. 113 (1973), el tribunal de mayor jerarquía en Estados Unidos se adhirió nuevamente al principio de que existe un derecho de privacidad personal implícito en la Primera, Cuarta, Quinta, Novena y Decimocuarta Enmiendas, y en las penumbras de la Carta de Derechos, bastante amplio como para cubrir cierto tipo de decisión íntima. En Cleveland Board of Education v. LaFleur, 414 U.S. 632 (1974), el Tribunal Supremo estadounidense insistió en admitir que la libertad personal de tomar decisiones (freedom of personal choice) relacionadas a asuntos maritales y familiares es una de las libertades resguardadas por la Decimocuarta Enmienda del referido texto constitucional. Añadió que el Estado estaba impedido, tanto a imponer una carga indebida (undue burden) como a obstaculizar arbitraria o caprichosamente el ejercicio de dichas libertades. La doctrina antes expuesta fue reiterada en Zablocki v. Redhail, 434 U.S. 374 (1978), donde además se añadió que el estado tampoco puede disminuir, de manera injustificada, la libertad a tomar decisiones personales en torno a asuntos matrimoniales y familiares.(35)
Un año antes, la jurisprudencia estadounidense había reconocido dos clases de intereses relacionados a la intimidad que deben ser protegidos constitucionalmente. En Whalen v. Roe, 429 U.S. 589, 598-599 (1977), se estableció *364 dicha bifurcación entre, por un lado, el interés individual en evitar la divulgación de asuntos personales, y por el otro, el interés individual cimentado sobre la autonomía personal para tomar cierto tipo de decisión importante. El tribunal estableció que hay limitaciones en el poder regulador del Estado cuando están involucradas estas decisiones. Schoeman explica que esta concepción de la intimidad, la que comprende aspectos de la autonomía de la voluntad sin limitarse a la intimidad física o de la información, es de las más abarcadoras. El autor expone que, según esta concepción, la intimidad es la medida del espacio social y legal que debe concedérsele a un individuo para que desarrolle los poderes emocionales, cognoscitivos y espirituales propios de un ente autónomo.(36)
En Moore v. City of East Cleveland, 431 U.S. 494 (1977), el Tribunal Supremo declaró haber reconocido consecuentemente una esfera privada de la vida familiar en la que el estado no puede inmiscuirse sin exponer los intereses gubernamentales de su intrusión. Dicho caso explicó que el alcance de la protección constitucional y libertaria en cuanto a las decisiones familiares que brinda la Decimocuarta Enmienda no puede reducirse a una fórmula particular, sino que queda sujeta a un juicio valorativo entre la libertad individual y las necesidades de la vida en sociedad. Según el Tribunal Supremo, la libertad encarnada en el debido proceso de ley sustantivo es un continuo racional que traza sus linderos en los valores intrínsecos de la cultura occidental, y se extiende para proteger los modos de realización individual que subyacen en los diversos estamentos de una sociedad libre.
Finalmente, el caso normativo Planned Parenthood of Southeastern P.A. v. Casey, 505 U.S. 833 (1992), introdujo una nueva vertiente de corte subjetivista en la línea de casos sobre la libertad personal y la autonomía individual. Allí quedó instituido el principio de que existe tal cosa como una promesa constitucional de establecer un ámbito *365 de libertad personal en la que el estado no ha de intervenir. El caso amplía el concepto libertario del debido proceso de ley sustantivo y establece que los asuntos que involucran decisiones de carácter íntimo y personal constituyen el eje de la dignidad y la autonomía personal, conceptos que a su vez son constitutivos de la libertad protegida por la Enmienda Decimocuarta. La opinión expresa que en la médula de la libertad radica el derecho de las personas a definir conceptos individuales de índole existential y resolver cuestionamientos característicos de la condición humana. No sería posible foijar la personalidad propia si la definición de dichos conceptos y cuestionamientos estuviera sujeta al imperio del Estado.(37)
Las doctrinas antes expuestas fueron reproducidas en Lawrence et al. v. Texas, 539 U.S. 558 (2003), donde además se explicó que la libertad se extiende más allá de límites espaciales. Según el Tribunal, la libertad comprendida en la garantía al debido proceso de ley sustantivo presume una autonomía personal del ser que incluye la libertad de pensamiento, creencias, expresión y la libertad para llevar a cabo cierta conducta íntima. Con dichas decisiones, la libertad reconocida por el debido proceso de ley se divorcia de la anterior concepción tradicionalista que situaba la protección libertaria en cerrada relación diada con ciertos valores tradicionalmente reconocidos en la sociedad democrática. Los lindes de la libertad quedaban sujetos a una presunta convención social mediante la cual “la sociedad democrática” delineaba ciertos valores considerados propios de la democracia.
A través de la jurisprudencia estadounidense, el matrimonio se ha ido alejando de la antigua visión correspondiente a las sociedades agrarias. Dicha visión ha cedido a *366 favor de una perspectiva más a tono con el amor, el afecto, los sentimientos involucrados en la decisión de asociarse con otro ser humano y la libertad necesaria para tomar una decisión tan íntima. En Griswold v. Connecticut, supra, pág. 486, el Tribunal Supremo de Estados Unidos describió al matrimonio como una asociación que promueve un estilo de vida, una asociación con un propósito tan noble como otras asociaciones. Años después, en Roberts v. United States Jaycees, 468 U.S. 609 (1984), el Tribunal Supremo estadounidense reconoció haber interpretado la protección constitucional al derecho a la asociación en dos sentidos. De un lado se encuentra la conocida protección que la Primera Enmienda brinda al derecho de asociación como parte del derecho a la libre expresión; del otro, la protección a la decisión de las personas a entrar en ciertas relaciones íntimas, sin la intrusión indebida del Estado. El Tribunal explicó que el rol de la protección a este tipo de asociación íntima es cardinal para el aseguramiento de la libertad individual que constituye la esencia de nuestro esquema constitucional.
En Roberts v. United States Jaycees, supra, el Tribunal Supremo de Estados Unidos señaló, como lo ha hecho desde principios del siglo XX, que el propósito de la Carta de Derechos es asegurar la libertad individual. Por eso, reiteró su deber de proporcionar una medida sustancial para amparar la formación y conservación de cierto tipo de relación personal frente a interferencias estatales injustificadas. De acuerdo con dicho principio, el Tribunal reconoció que existe cierto tipo de lazo interpersonal que ocupa un lugar determinante en la cultura y en las tradiciones occidentales. Dichas relaciones, según lo articuló el Tribunal, fomentan la diversidad al promover el desarrollo y el intercambio de ideales y creencias, además del enriquecimiento emocional del que gozan los individuos al entablar lazos íntimos con otros.(38) Al proteger estas relacio *367 nes interpersonales de interferencias estatales injustificadas, se garantiza la posibilidad de definir la propia identidad. Por eso, por lo que las salvaguardas constitucionales que merecen dichas relaciones resguardan los valores que constituyen el meollo mismo de la libertad en todas las posibles extensiones de ese concepto.
Para el Tribunal Supremo estadounidense, las relaciones familiares son el más claro ejemplo de las asociaciones interpersonales que merecen el más riguroso amparo constitucional, pues por su naturaleza, implican un profundo apego y compromiso. Además, las relaciones familiares presentan un contexto especial, poco comparable con otro tipo de asociación, en el que se comparten ideas, experiencias y pensamientos. Se trata, pues, de relaciones intrínsecamente relacionadas a la libertad. En palabras del Tribunal Supremo de Estados Unidos:
The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one’s relatives. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one’s life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations *368 that have led to an understanding of freedom of association as an intrinsic element of personal liberty. (Citas omitidas.)(39)
En M.L.B. v. S.L.J., 519 U.S. 102 (1996) el Tribunal declaró que las decisiones sobre el matrimonio, la vida familiar y la crianza de los hijos se encuentran entre los derechos de asociación que el estado no puede usurpar, ignorar o violentar. Ver, también, Overton v. Bazzetta, 539 U.S. 126 (2003).
En Puerto Rico, a diferencia de Estados Unidos, el derecho a la intimidad consta expreso en nuestra Constitución. El Art. II, Sec. 8 de nuestra Carta de Derechos, L.P.R.A., Tomo 1, ed. 1999, pág. 301, reconoce que “ [t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar”. Hace casi tres décadas, en Figueroa Ferrer v. E.L.A., supra, tuvimos la oportunidad de expresarnos en torno al derecho a la autonomía de la voluntad y los derechos de la personalidad, según protegidos por el derecho a la intimidad y su relación con la institución matrimonial y su disolución. Comenzamos nuestra opinión reconociendo el ancho campo que abarca el derecho a la intimidad en nuestra sociedad. Al respecto citamos nuestra jurisprudencia, que establece que
[e]n la sociedad democrática organizada alrededor de los derechos fundamentales del hombre, el Estado ha de reducir a un mínimo su intervención con sensitivas urdidumbres emocionales como lo son las relaciones de familia. La intromisión en la vida privada solo ha de tolerarse cuando así lo requieran factores superantes de salud y seguridad públicas o el derecho a la vida y la seguridad de ser humano afectado. Figueroa Ferrer v. E.L.A., supra, pág. 259.
En dicha opinión adoptamos la jurisprudencia estadounidense hasta aquel momento resuelta que reconoce la protección constitucional a la libertad de tomar decisiones sobre asuntos familiares. Además, reconocimos que el *369 campo de los derechos humanos con aspiración de universalidad ha evolucionado al punto de incluir ciertos aspectos de las relaciones familiares. En Pueblo v. Duarte Mendoza, 109 D.P.R. 596 (1980), aclaramos que las protecciones constitucionales que tienen su base en el concepto de libertad personal protegido por las cláusulas del debido proceso de ley de las Enmiendas Quinta y Decimocuarta de la Constitución federal, se extienden a Puerto Rico. Por esto, el derecho a la intimidad en nuestra jurisdicción, al igual que en la estadounidense, se lesiona cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas.
En Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178 (1998), nos hicimos eco de las expresiones de Trías Monge en cuanto a que la protección a los derechos de autonomía personal imponen al Estado una función dual: abstenerse de actuar en una forma que viole el ámbito de autonomía e intimidad individual y actuar de forma positiva en beneficio del individuo. J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, E.D.U.P.R., 1981, Vol. II, pág. 200. Es decir, el Estado tiene, tanto el deber de no inmiscuirse irrazonablemente en la toma de decisiones sobre asuntos familiares y personales, como el deber de proveer mecanismos para que las personas puedan desarrollar sus respectivas personalidades en diversos ámbitos pertenecientes a las zonas íntimas de la vida humana en sociedad.
El derecho de autonomía en la toma de decisiones sobre la vida íntima o familiar sin que medie la intervención indebida del Estado o de personas particulares, no puede es-tar supeditado a factores externos que impidan sustancialmente su libre ejercicio. Belk v. Martínez, 146 D.P.R. 215 (1998). En nuestra jurisdicción, cualquier interferencia con alguna de estas decisiones protegidas por el derecho fundamental a la intimidad estará sujeta al escrutinio estricto y sólo podrá sostenerse si el estatuto pretende específicamente adelantar un interés estatal apremiante. López v. *370 E.L.A., 165 D.P.R. 280 (2005). Cuando el Estado intervenga en estos ámbitos protegidos, tendrá que demostrar que existe un interés apremiante que justifique la intromisión o limitación, y que dicha limitación es necesaria para alcanzar dicho interés.
La libertad de tomar la decisión de asociarse íntimamente y el derecho a establecer vínculos íntimos implica la libertad para desligarse de dichos lazos voluntarios. En Figueroa Ferrer v. E.L.A., supra, aludimos a diversos autores como McDougal y Lasswell,(40) que condenaban las limitaciones irrazonables a la libertad para terminar relaciones personales disfuncionales. Para los autores, dicha libertad forma parte del derecho de todo ser humano a participar en los procesos afectivos. Concluimos que, en ausencia de intereses públicos apremiantes, el Estado no puede violar la zona de intimidad protegida por la See. 8 del Art. II de la Constitución, supra; más aún, dijimos que es alta responsabilidad del Estado velar por la adecuada protección de las partes que disuelven su vínculo matrimonial. Declaramos en dicha ocasión que el Estado no puede obligar a dos seres humanos a permanecer atados cuando el vínculo está indudablemente deshecho.
Por los asuntos de gran interés público que rodean el lazo conyugal, particularmente cuando hay propiedades y menores involucrados, el Estado ha monopolizado el medio para disolver el matrimonio. El Art. 95 del Código Civil, 31 L.P.R.A. see. 301, prescribe que “[e]l vínculo del matrimonio se disuelve en los siguientes casos:
(1) Por la muerte del marido o de la mujer.
(2) Por el divorcio legalmente obtenido.
(3) Si el matrimonio se declarase nulo.”
Por su parte, el Art. 97 del Código Civil, 31 L.P.R.A. see. 331, establece el único procedimiento para obtener un divorcio. Según dicho precepto, “[e]l divorcio sólo puede ser *371 concedido mediante juicio en la forma ordinaria y por sentencia dictada por el Tribunal Superior”. No existe circunstancia dentro de la cual un matrimonio celebrado válidamente pueda disolverse en vida de los cónyuges si no es mediando el aparato judicial. Ahora bien, según resolvió el Tribunal Supremo de Estados Unidos en Boddie v. Connecticut, 401 U.S. 371 (1971), hay intereses libertarios involucrados en la disolución del vínculo matrimonial. Por eso, para limitar el acceso a los Tribunales para obtener una sentencia de divorcio, el Estado debe demostrar intereses que contrarresten suficientemente dichos intereses libertarios.
En el caso United States v. Kras, 409 U.S. 434 (1973), el Tribunal Supremo de Estados Unidos explicó que negar el acceso al foro judicial, como ocurrió en Boddie v. Connecticut, supra, perturba directamente la relación matrimonial, y trastoca los derechos de asociación que circundan el establecimiento y disolución del matrimonio. El Tribunal aprovechó la ocasión para recalcar la importancia fundamental de los intereses de asociación bajo la Constitución de Estados Unidos y resaltó que el impedimento a terminar un matrimonio impide a los cónyuges entrar en nuevas relaciones consensúales de índole íntima.
Así mismo, el Art. 70-A de nuestro Código Civil, 31 L.P.R.A. sec. 232a, establece que hombre y mujer no quedan en aptitud de formalizar nuevo matrimonio hasta luego de la disolución del matrimonio anterior. No es hasta tanto se disuelve el matrimonio que las personas pueden asociarse íntimamente con otras. Además, la conducta adúltera y bígama está tipificada como un delito, por lo que la limitación al divorcio conlleva un impedimento a involucrarse en cierto tipo de actividades de asociación íntima.(41)
Como dijéramos en Figueroa Ferrer v. E.L.A., supra, la *372 institución del divorcio ha sufrido notables cambios a través de los tiempos. En dicha ocasión, adecuamos el derecho privado a la realidad imperante y aplicamos, tanto las doctrinas constitucionales vigentes como los derechos humanos reconocidos internacionalmente sobre el derecho a la intimidad y a la dignidad humana en temas familiares. En aquel momento encontramos que la normativa sobre el divorcio y las causales aceptadas en nuestra jurisdicción creaban dos tipos de lesión al derecho a la intimidad. Por un lado, el caso Figueroa Ferrer v. E.L.A., supra, involucraba la lesión al derecho de la autonomía de la voluntad de los cónyuges al verse limitado su derecho a disolver el lazo matrimonial mediante unas causales con las que no podían cumplir sin ocasionar fraude al tribunal. Por otro lado, en dicho caso estaba involucrada otra lesión al derecho a la intimidad y dignidad de los cónyuges al verse obligados a divulgar información personal sobre sus vidas íntimas para establecer cualquier causal de divorcio.
Al atender las controversias planteadas nos vimos en la obligación de ampliar los modos para disolver un matrimonio, más allá de las causales basadas en conceptos de culpa. De modo que reconocimos la intromisión indebida e injustificada del Estado al imponer normas imperativas,(42) según las cuales la disolución de la asociación matrimonial quedaba circunscrita a ciertas causales específicas. Para subsanar la lesión a la autonomía de la voluntad de los cón *373 yuges que comparecieron ante nos en Figueroa Ferrer v. E.L.A., supra, nos vimos en la necesidad de declarar inconstitucional la parte del Art. 97 de nuestro Código Civil, supra, que prohíba la colusión entre los cónyuges para obtener el divorcio. Por los hechos que dieron pie a la controversia, el consentimiento mutuo fue la causal que se aplicó a quienes ya estaban de acuerdo en divorciarse. No tuvimos la ocasión de expresarnos sobre otras posibles maneras de encausar el derecho de los cónyuges a realizar su voluntad íntima.
No podemos ahora hacer de nuestra opinión en Figueroa Ferrer v. E.L.A., supra, una camisa de fuerza para limitar los derechos que precisamente quisimos reconocer hace casi tres décadas. El caso de autos trata sobre la primera lesión que atendimos en Figueroa Ferrer, supra, a saber, la lesión al derecho de autonomía de la voluntad para decidir disolver el vínculo matrimonial. No debemos obviar que el carácter compulsorio de la ley canaliza la expresión que el individuo manifiesta al tomar una decisión.(43) El derecho humano a la búsqueda de la felicidad a través del afecto y la asociación íntima impone una protección de la autonomía de la voluntad individual que deja en claro descrédito el obstáculo injustificado que es la imposición taxativa de causales de divorcio. A fin de cuentas, el divorcio no es sino la manifestación jurídico-procesal del fracaso de una unión matrimonial. Por tal razón, y a tono con la doctrina antes expuesta, resolvería que el Estado no puede imponer unas causales de divorcio cuyo origen y propósito no tienen nada que ver con la concepción abarcadora de la libertad individual del ser humano que hoy se reconoce en otras jurisdicciones bajo el debido proceso de ley sustantivo y la protección a la intimidad.
Hace una década Serrano Geyls(44) dijo lo siguiente:
No sabemos lo que resolvería el [Tribunal Supremo] si uno de los esposos reclamara su derecho a divorciarse sin tener que esperar el período de dos años de la causa de separación y sin tener que revelar sus intimidades. Sería muy extraño, con *374 siderando el fundamental derecho a la intimidad en que se asienta el caso Figueroa, que el [Tribunal Supremo] se negara a darle rango constitucional al divorcio fundado en la ruptura irreparable del matrimonio.
Sin duda nos encontramos ante un “extraño” evento jurídico. La opinión mayoritaria no representa sino un escollo para quienes recurren ante la Rama Judicial a vindicar sus derechos personales confiados en la presunta sensatez de la discreción judicial y en los principios básicos de independencia judicial. Trías Monge,(45) al alertarnos sobre los factores que minan la independencia judicial, señaló “nuestra inclinación ocasional a la búsqueda de la explicación superficial y fácil de las dificultades que confrontamos, al uso de peligrosos mecanismos de reacción”. La opinión de la cual enérgicamente disentimos presenta uno de esos mecanismos de reacción de los cuales nos alertaba Trías Monge.
Es el sentir de ciertos comentaristas que la llamada “revolución divorcista” de los años setenta es la causa de la disgregación familiar y de los consecuentes males sociales que acarrea la decadencia de tan fundamental institución.(46) Así, por ejemplo, hay comentaristas que arguyen que por ser la familia matrimonial la idónea para el desarrollo de ciudadanos estables y moralmente íntegros, el Estado debe limitar las causas para la disolución matrimonial, haciendo caso omiso de la poca idoneidad de un matrimonio que ha perdido su fundamento afectivo y mutuo compromiso.
Hoy la Mayoría del Tribunal parece unirse a estos comentaristas al decidir que el Estado tiene un interés apremiante en mantener la unión matrimonial. Como fundamento para tal declaración nos refiere al caso Almodóvar v. *375 Méndez Román, 125 D.P.R. 218 (1990), donde, en el contexto de una acción de impugnación de filiación y en defensa del concepto de legitimidad de los hijos nacidos dentro del matrimonio, establecimos que la protección de la institución del matrimonio (no de la unión matrimonial) constituye un interés apremiante del Estado. Dicho interés apremiante se articuló en consideración a la presunción de legitimidad de los hijos nacidos dentro del matrimonio. Ex-plicamos que “el matrimonio confiere certeza en la paternidad”, por lo que es “más fácil la reclamación de una filiación matrimonial y más difícil su impugnación”. íd., pág. 236. El interés en la protección de la institución matrimonial que formulamos en Almodóvar v. Méndez Román, supra, formó parte de una defensa a la naturaleza de las acciones filiatorias y de impugnación de paternidad y sus términos prescriptivos, no a un interés en mantener una relación matrimonial que ya ha perdido la motivación para cumplir con sus recíprocas obligaciones.
En su somero análisis, la Mayoría ha extrapolado conceptos. Ciertamente hemos reconocido antes que el matrimonio es una institución civil claramente protegida y establecida en nuestro orden social y jurídico, por lo cual ocupa un lugar predominante y fundamental en la sociedad puertorriqueña. In re Hon. González Porrata-Doria, 158 D.P.R. 150, 157—158 (2002). Véanse, además: Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999); Sostre Lacot v. Echlin of P.R., Inc., 126 D.P.R. 781 (1990). Pero la opinión mayoritaria confunde lo que implica proteger jurídicamente la existencia de una institución y el fomento de la política pública que promueve un modelo familiar matrimonial,(47) con la imposición de dicha política pública a toda costa. Ni los materiales etnográficos ni los historiográficos permiten hoy proponer la universalidad de la familia nuclear.(48) La diferencia en el modo como son *376 realizadas las funciones sexuales, reproductivas y económicas promueve una configuración cambiante del grupo familiar:
Con el desarrollo del estado primero y con la revolución industrial después, los grupos de parientes, y en particular la familia, han perdido fiínciones políticas y productivas. El movimiento feminista modificó el reparto de papeles procreativos y las nuevas tecnologías reproductivas lo están modificando arm más. Pero no debemos pensar en un modelo uniforme de familia, propio de todas la sociedades o al que todas tenderían, ni en términos de la “vieja” familia nuclear ni de la “nueva” familia de doble carrera, con trabajo de la mujer fuera del hogar, con un número de hijos que no llega a alcanzar la tasa de reproducción divorcio frecuente y núcleos monoparentales. El mundo es muy diverso, y se está generando constantemente diversidad cultural.(49)
Proveer cauces procesales compatibles con el desarrollo de la autonomía de la voluntad en materia de divorcio no debilita ni desarticula las instituciones del matrimonio y de la familia. Todo lo contrario, al facilitar los procesos para que las parejas encaucen judicialmente sus desavenencias y pongan fin a relaciones voluntarias que por múltiples razones se han tornado insalvables, se promueve la solución pacífica y el dialogo saludable dentro de una familia que pasa por momentos difíciles. Decir que el Estado tiene un interés apremiante en mantener casadas a las personas, aún en contra de la voluntad de uno de los cónyuges no denota otra cosa que una lectura superficial de nuestra jurisprudencia y un decepcionante retroceso jurídico, producto de un análisis apresurado y enajenado de la realidad social.(50) No podemos aspirar a mejor meta que gozar de un derecho de familia maduro que promueva la tranquilidad y estabilidad que brinda la sinceridad en las relaciones personales.
Hoy estamos lejos de aquella extrema vulnerabilidad a la que se exponían las personas luego de un divorcio. Las *377 familias cuentan con las debidas protecciones procesales y sustantivas que mediante legislación y vastísima jurisprudencia el Estado se ha ocupado de estructurar. Por eso, los verdaderos intereses apremiantes del Estado en procesos de divorcio son aquellos relacionados a sus poderes de parens patriae y a la obligación de garantizar el derecho a la vida y la dignidad humana. El Estado está obligado a intervenir en todo aquello que implique el bienestar de los menores, por ejemplo la fijación de los alimentos, la patria potestad y la custodia. Los alimentos entre ex cónyuges, y la división de los bienes del matrimonio también son cuestiones que el Tribunal tiene que dirimir y cuya guarda corresponde a un interés apremiante del Estado.
La Mayoría declara que acceder a los reclamos de la apelante implica reconocer un divorcio unilateral que violentaría el debido proceso de ley (en su vertiente procesal) del otro cónyuge al no darle una oportunidad para ser oído durante el proceso de divorcio. Al hacerlo, tal parece que la Mayoría hace abstracción de la realidad. Un proceso de divorcio como el que solicita la apelante le brinda la oportunidad al cónyuge demandado a comparecer y a ser oído. Ahora bien, el demandado puede expresar su objeción a un decreto de divorcio. Pero, ¿de qué manera puede el Tribunal adjudicar un pleito en el que una parte declare que desea divorciase y otra que no? La sana discreción del Tribunal debe limitarse en tales casos a cerciorarse de que las partes comprenden las consecuencias legales del divorcio; asegurarse de que ninguna de las partes opera bajo coacción o alguna de las causas que anulan los actos jurídicos y que ambas partes poseen plena capacidad para actuar.
Por último, debo resaltar que la opinión mayoritaria no explica cuál es el hecho principal que trajo esta controversia ante nuestra consideración. La peticionaria no se puede poner de acuerdo con su cónyuge para articular las estipulaciones requeridas en el procedimiento de divorcio por mutuo consenso. Por esta razón, solicita que se reconozca un modo contencioso de encausar su decisión de terminar el matrimonio sin que tenga que recurrir a las causales cul *378 posas que establece el Código Civil. La opinión que la mayoría del Tribunal suscribe tampoco demuestra cuáles son los intereses apremiantes del Estado para no concederle a la peticionaria el derecho que solicita, limitando así indebidamente su capacidad para tomar decisiones familiares y de asociación protegidas constitucionalmente.
Los derechos que están en juego son fundamentales y esenciales para el pleno desarrollo de la peticionaria, quien desea terminar con una relación a la que entró voluntariamente. La situación en la que se ha colocado a la peticionaria la obliga a recurrir a los mecanismos que condenamos en Figueroa Ferrer v. E.L.A., supra, o a mantenerse cautiva en una relación que estanca su evolución personal e íntima. Como hemos explicado, en Figueroa Ferrer, supra, no abundamos sobre la causal de ruptura irreparable, porque no era necesario para atender los hechos de aquel caso. Ello no nos impide reconocer esa causal ante irnos hechos meritorios. Como dijéramos en aquella opinión, cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, el principal deber de la Judicatura es el que sus decisiones propendan a tal fin.
Por tales consideraciones revocaría la sentencia del Tribunal de Apelaciones y devolvería el caso al Tribunal de Primera Instancia para que se le permita a la peticionaria emplazar a su cónyuge, de modo que se dé a éste la oportunidad de comparecer a una vista evidenciaría, para que la peticionaria pueda terminar el vínculo voluntario que una vez estableció con su pareja con la misma libertad con la que contrajo matrimonio.

 D. Espín Cánovas, Manual de Derecho Civil Español, 8va ed., Madrid, Ed. Rev. Der. Privado, 1984, Vol. IV, pág. 16. La frase latina en español significa que el matrimonio es “el fundamento de la ciudad y el semillero del Estado”.

 M.E. Wiesner-Hanks, Cristianismo y sexualidad en la edad moderna, Madrid, Ed. Siglo XXI, 2001.

 J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1985, T. IV, pág. 2.

 J. Vallet de Goytisolo, Panorama del Derecho Civil, Barcelona, Ed. Bosch, 1963, pág. 240 et seq.

 Puig Brutau, op. cit., pág. 3.

 Véanse: Jenofonte, Economía; M. Foucault, Historia de la Sexualidad, (T. Segovia, trad.), lima ed., Madrid, Ed. Siglo XXI, 1999, Vol. III, págs. 69-93 y 137-174; Wiesner-Hanks, op. cit.

 Sobre la evolución del matrimonio en Roma, Foucault piensa solamente como una “ ‘forma matrimonial’ que fija la complementariedad de los papeles en la gerencia de la casa, sino también, y sobre todo, como un ‘lazo conyugal’ y relación personal entre el hombre y la mujer”. Foucault, op. cit., pág. 140. Por su parte Wiesner-Hanks, explica que “[l]a noción estoica de que los esposos debían sentir ‘afecto marital’ (affectio maritalis) uno hacia el otro fue ganando popularidad en los siglos I y II [de la era común]; si ese afecto ya no se sentía, el divorcio formal o una separación menos formal podían poner fin al matrimonio”. Weisner-Hanks, op. cit., pág. 6.

 Art. 69 del Código Civil, 31 L.P.R.A. see. 231.

 E. Vázquez Bote, Derecho Privado Puertorriqueño, San Juan, Ed. Butterworth, 1993, T. XI, págs. 21-36.

 íd„ pág. 21.

 L. Arechederra en J. Lacruz Berdejo, Matrimonio y divorcio: comentarios al nuevo título IV del libro primero del Código Civil, Madrid, Ed. Civitas, 1982, pág. 79.

 “Constantino y los emperadores posteriores deseaban restringir las posibilidades de divorcio, y la mayoría de las autoridades de la Iglesia siguieron a [San] Agustín”, quien desaconsejaba el divorcio. Wiesner Hanks, op. cit., pág. 15.

 J. Arias Ramos y J.A. Arias Bonet, Derecho Romano, 17ma ed., Madrid, Ed. Rev. Der. Privado, 1984, Vol. II, págs. 734-735.

 P. Bonfante, Instituciones de Derecho Romano, 3ra ed., Madrid, Ed. Reus, 1965, págs. 189-194. Véase, también, Arias Ramos y Arias Bonet, op. cit.

 Wiesner-Hanks, op. cit., pág. 12.

 íd., pág. 15.

 íd.

 íd., pág. 24.

 Mediante la Ley Núm. 46 de 9 de mayo de 1933.

 M. Delmas-Marty y C. Labrusse-Riou, Matrimonio y Divorcio, Bogotá, Temis, 1987, pág. 75.

 Ello no obstante, un estudio actualizado sobre los requisitos temporales de la causal de separación a la luz del desarrollo de la autonomía de la voluntad puede iluminamos para resolver razonablemente la controversia que hoy nos ocupa.

 Véanse: J.B. Singer, The Privatization of Family Law, 1992 (Núm. 5) Wis. L. Rev. 1443; C.E. Schneider, Moral Discourse and the Transformation of American Family Law, 83 (Núm. 8) Mich. L. Rev. 1803 (agosto 1985).

 J. Raz, The Morality of Freedom, Nueva York, Oxford University Press, 1986, págs. 370-399.

 J. Puig Brutau, op. cit., 1979, T. I, Vol. 1, Ira parte, pág. 60.

 L. Diez-Picazo y A. Gullón, Sistema de Derecho Civil, 9na ed., Madrid, Ed. Tecnos, 1997, Vol. I, pág. 324.

 Diez-Picazo y Gullón, op. cit., 7ma ed., 1989, Vol. I, pág. 351.
Para un excelente comentario sobre la influencia del constitucionalismo en el Derecho Privado en Puerto Rico, véase J.J. Álvarez González, La reforma del Código Civil de Puerto Rico y los imperativos constitucionales: un comentario, 52 (Núm. 2) Rev. C. Abo. P.R. 223 (abril-junio 1991). El profesor Álvarez González hace un recuento de las opiniones de este Tribunal que, prescindiendo de la acción legislativa, han declarado inválidas varias disposiciones del Código por violentar diversos principios constitucionales. Entre éstas opiniones se encuentran Ocasio v. Díaz, 88 D.P.R. 676 (1963), González v. Tribunal Superior, 97 D.P.R. 804 (1969), y Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978). Resulta apropiado mencionar otras opiniones que han atemperado distintas instituciones del Código Civil a las doctrinas constitucionales imperantes o que han reconocido una dimensión más personal en el derecho de familia, por ejemplo: Caraballo Ramírez v. Acosta, 104 D.P.R. 494 (1975); Romero Soto v. Morales Laboy, 134 D.P.R. 734 (1993); Rexach v. Ramírez, 162 D.P.R. 130 (2004). *359 En Puerto Rico urge la reforma de un Código Civil compuesto sesenta y tres años antes que nuestra Constitución, legislado en su mayor parte por mentes extranjeras y reformado fragmentaria e insuficientemente. Véase J. Trías Monge, Consideraciones sobre la reforma del Código Civil de Puerto Rico, 52 (Núm. 2) Rev. Jur. U.P.R. 143, 145 (1983). Mientras una reforma cabal no tenga lugar, somos los llamados a revisar sus caducadas disposiciones a la luz de la Constitución. Figueroa Ferrer v. E.L.A., supra.

 E. Vázquez Bote, op. cit, Orford, Equity, T. III, pág. 473.

 íd., pág. 478. Ver, también, J. Santos Briz, Tratado de Derecho Civil, Barcelona, Ed. Bosch, 2003, T. I, págs. 369-406.

 Vázquez Bote, op. cit., pág. 478.

 pj) Schoeman, Privacy and Social Freedom., Nueva York, Cambridge University Press, 1992, págs. 13-23.

 C. Fried, Privacy [a moral analysis], en F.D. Shoeman, Philosophical Dimensions of Privacy: an Anthology, Nueva York, Cambridge University Press, 1984, págs. 203-222.

 En palabras del autor: “lb respect, love, trust and feel affection is at the heart of our notion of ourselves as persons among persons, and privacy is the necessary atmosphere for these attitudes and actions, as oxygen is for combustion.” Fried, op. cit., pág. 205.

 L.J. Mieres Mieres, Intimidad personal y familiar: prontuario de jurisprudencia constitucional, Navarra, Ed. Aranzadi, 2002, pág. 27.

 El fragmento antes parafraseado de la opinión disidente lee como sigue:
“The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man’s spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.” (Énfasis nuestro.) Olmstead v. United States, 277 U.S. 438, 478 (1928). Véase, también, S.D. Warren y L.D. Brandeis, The Right of Privacy, 4 (Núm. 5) Harv. L. Rev. 194 (1890).

 Véanse, además: Smith v. Organization of Foster Families, 431 U.S. 816, 842-844, (1977); Carey v. Population Services International, 431 U.S. 678, (1977); Paul v. Davis, 424 U.S. 693, 713 (1976); Roe v. Wade, 410 U.S. 113, 152-153, (1973); Eisenstadt v. Baird, 405 U.S. 438, 453-454 (1972); Prince v. Massachusetts, 321 U.S. 158, 166 (1944); Skinner v. Oklahoma, 316 U.S. 535, 541-542 (1942); Pierce v. Society of Sisters, 268 U.S. 510, 535 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

 Schoeman, op. cit., pág 13.

 La doctrina que antes parafraseamos lee en su texto original como sigue:
“These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.” Planned Parenthood of Southeaster P.A. v. Casey, 505 U.S. 833, 851 (1992).

 Para llegar a dicha conclusión, el Tribunal Supremo utilizó a Meyer v. Nebraska, supra, pág. 399; Pierce v. Society of Sisters, supra, págs. 534-535; Olmstead v. United States, supra, pág. 478 (disidente de Brandeis); N.A.A.C.P. v. Alabama, 357 *367 U.S. 449, 460-462 (1958); Poe v. Ullman, 367 U.S. 497, 522 (1961) (disidente de Harlan); Griswold v. Connecticut, 381 U.S. 479, 482-485 (1965); Stanley v. Georgia, 394 U.S. 557, 564 (1969); Wisconsin v. Yoder, 406 U.S. 205, 232 (1972); Stanley v. Illinois, 405 U.S. 645, 651-652 (1972); Gilmore v. City of Montgomery, 417 U.S. 556, 575 (1974); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 639-640 (1974); Moore v. East Cleveland, 431 U.S. 494, 503-504 (1977); Carey v. Population Services International, supra, págs. 684-686; Smith v. Organization of Foster Families, supra, pág. 844; Zablocki v. Redhail, 434 U.S. 374, 383-386 (1978); Quilloin v. Walcott, 434 U.S. 246, 255 (1978).

 Roberts v. United States Jaycees, 468 U.S. 609, 619-620 (1984).

 M.S. McDougal, H.D. Lasswell y L. Chen, Human Rights and World Public Order: Human Rights in Comprehensive Context, 72 (Núm. 2) Nw. U.L. Rev. 227, 235, 255 (mayo 1977).

 Nuestro Código Penal considera la siguiente conducta como constitutiva de delito contra el estado civil:
“Bigamia. Toda persona que contrae un nuevo matrimonio sin haberse anulado o disuelto el anterior o declarado ausente el cónyuge conforme dispone la ley incurrirá en delito menos grave.” Art. 126 del Código Civil, 33 L.P.R.A. see. 4754.
*372 “Adulterio. Toda persona casada que tenga relaciones sexuales con una persona que no sea su cónyuge incurrirá en delito menos grave....” Art. 130 del Código Civil, 33 L.P.R.A. see. 4758.

 Como explicó el Juez Negrón García en su opinión concurrente en In re López Olmedo, 125 D.P.R. 265, 268 esc. 1 (1990):
“Son normas imperativas, o de ‘ius cogens’, aquellas cuyo mandato es de inexcusable cumplimiento, debiéndose ajustar la conducta de la persona, su comportamiento, a lo establecido por la norma para que sus actos tengan validez y eficacia jurídica .... Mientras que las normas facultativas o dispositivas conceden a la autonomía de la voluntad privada un margen de facultades distinto del preceptuado en las propias normas, en las imperativas y prohibitivas ese margen de autonomía queda eliminado, teniéndose que acomodar la actuación de las personas a lo preceptuado concretamente en el mandato normativo.”

 Schoeman, op. cit., pág. 25.

 R. Serrano Geyls, El derecho de familia de Puerto Rico y legislación comparada, San Juan, Programa de Educación Jurídica Continua UIPR, 1997, pág. 532.

 J. Trías Monge, El sistema judicial de Puerto Rico, 2da ed., Río Piedras, E.D.U.P.R., 1988, pág. 171.

 Véanse, por ejemplo: L.D. Wardle, Divorce Reform at the Turn of the Millenium: Certainties and Possibilities, 33 (Núm. 3) Fam. L.Q. 783 (otoño 1999); P.N. Swisher, Reassessing Fault Factors in No-Fault Divorce, 31 (Núm. 2) Fam. L.Q. 269 (1997); Marriage in America: A Report to the Nation, Council on Families in America, Institute for American Values, Nueva York, 1995.

 Almodóvar v. Méndez Román, supra, pág. 236.

 A. Aguirre-Baztán, Diccionario Temático de Antropología, 2da ed., Barcelona, Ed. Boixareu Universitaria, 1993, pág. 323.

 íd., pág. 325.

 para un buen ejemplo de la situación que debemos evitar, véase Dimas v. Ortiz, 8 D.P.R. 418 (1905).